698 A.2d 560

VISITATION RIVERA, PLAINTIFF, v. SOUTHERN RAILROAD COMPANY OF NEW JERSEY AND CARL BEAMER, DEFENDANTS.

Superior Court of New Jersey
Law Division
Camden County

Decided December 13, 1996.

118

*George S. Arslanian, Jr.*, for plaintiff.

*Carol A. Stevens*, for defendants (Watson, Stevens, Fiorilla & Rutter, Attorneys).

VOGELSON, P.J.S.C.

This matter is before the court on cross motions by plaintiff to exclude evidence of the Northeast Operating Rules Advisory Committee (NORAC) rules and by defendant to exclude evidence of the Manual on Uniform Traffic Control Devices (MUTCD). They present the court with a question of first impression in New Jersey.

On January 9, 1992, at approximately 9:00 a.m., plaintiff Visitation Rivera (hereinafter Rivera) was traveling north on Mays Landing Road at a speed between 35–40 MPH in a Mack dump truck. Upon approaching a railroad grade crossing, Rivera noticed the railroad red warning lights flashing and began to slow down to about 15 MPH. As Rivera approached the tracks he saw defendant flagman Carl Beamer (hereinafter Beamer) standing in the middle of the roadway waiving a red flag. The sky at the time was overcast, it was raining lightly and vegetation prevented the plaintiff from seeing anything to his right. Rivera observed traffic ahead of him and on the opposite side of the road continuing, so he continued. By the time Rivera was on the tracks he noticed the shocked look on the face of Beamer who threw up his hands and ran southward to the left of the truck. It was then that Rivera

saw the train in his passenger side window. However, it was too late to react because in crossing the tracks, he had shifted the truck in to second gear low and had no power to accelerate. The train hit the truck on the passenger side turning it over on the driver's side. Prior to the accident, though Rivera saw the red warning lights flashing, he could not see or hear the train, since the train's horn never sounded. Beamer was there at the request of the railroad to protect the crossing so the train could keep on going and take less time to get where it was going.

In the instant case the court is asked to determine which of two sets of national regulations control when a motor vehicle is passing over a railroad grade crossing.

## MUTCD

The MUTCD rule which addresses flag signals is set out in the manual at Part VI, 6F.[1] This section concerns traffic controls for street and highway construction, maintenance, utility and incident management operations. The rules allude to the fact that there are several devices that can be used to signal traffic, some of which include hand signals, STOP/SLOW paddles, lights and red flags. The rules further specify that the use of flags should be limited to emergency situations. Though the MUTCD does not specifically define what an emergency is, MUTCD 6A5(c), entitled

---

[1] 6F-4 Flagging Procedures, provides:

1. To Stop Traffic. The flagger shall face traffic and extend the flag horizontally across the traffic lane in a stationary position so that the full area of the flag is visible hanging below the staff. For greater emphasis, the free arm may be raised with the palm toward approaching traffic.
2. When it is Safe for Traffic to Proceed. The flagger shall stand parallel to the traffic movement, and with flag and arm lowered from view of the driver, motion traffic ahead with the free arm. Flags shall not be used to signal traffic to proceed.
3. Where it is Desired to Alert or Slow Traffic. Where it is desired to alert or slow traffic by means of flagging, the flagger shall face traffic and slowly wave the flag in a sweeping motion of the extended arm from the shoulder level to straight down without raising the arm above a horizontal position.

responsibilities, warns that flagging procedures "... should only be employed when required to control traffic or when all other methods of traffic control are inadequate to warn and direct drivers." Considering the rules for traffic to be directed only by using hand signals, lights, stop/slow paddles, and flags, a fair reading of this section would only allow flags to be used when it is inadequate to use any of these other devices.

The Plaintiff argues that though the New Jersey Administrative Code does not specifically say that the MUTCD is the signal to be followed, New Jersey has adopted the MUTCD by reference. The foreward to subchapter 1, dealing with the Bureau of Traffic Engineering and Safety Program, says:

> The basic principles concerning the design and usage of traffic control devices contained in this Chapter are governed by the curent 'Manual on Uniform Traffic Control Devices for Streets and Highways'.... This manual adopted by the Federal Highway Administrator as a national standard for the application on all classes of highways, is adopted by reference herein.[2]

Defendant does not dispute that the MUTCD is in operation in New Jersey but rather asserts that the MUTCD only applies to road construction or hazardous conditions, and as neither of these conditions existed, the MUTCD does not apply. Plaintiff counters this argument by citing the MUTCD definition of Active Warning Devices which states:

> ... those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchman....
>
> [Section 646.204(j).]

Plaintiff argues that flag signals fall under the purview of this definition in that the flagman would be considered a crossing watchman, thereby making the MUTCD applicable.

---

[2] Though this section no longer reads this way, at the time of the accident the 5–20–91 Supplement applied; so it is from this supplement that the rule must be taken.

## NORAC

Under NORAC the Miscellaneous Signals section applies to flag signals. The NORAC signals must be given with a red flag during the day and a lamp at night. The rules stipulate that the following must be done with the flag to communicate:

(a) Stop

Swung horizontally at right angle to the track.

(b) Reduce speed

Held horizontally at arm's length

(c) Proceed

Raised and lowered vertically

(d) Back

Swung vertically in a circle at half arm's length, at right angle to the track.

Defendant argues that it is mandated by the United States Department of Transportation (US DOT) to implement operating rules and that the rules which it adopted were NORAC. Plaintiff does not dispute the fact that the railroad adopted NORAC. Plaintiff contends however the NORAC signals only apply to the movement of trains. NORAC has a specific section entitled "Highway Crossing Protection". Section (f) reads:

When an employee is required to provide on-ground protection at a highway crossing, he must give Stop Signals to pedestrian and highway traffic until the leading end of the train is through the crossing. Stop signals must be given with a red flag or fusses by day, and fusses or a white light at night.

From this section it is clear that, under certain conditions, railroad personnel are expected to give signals to highway traffic. The key word in this section however is "required". Though NORAC provides for situations in which flag signals may be given, following the strict language of the relevant section, unless the situation requires on-ground personnel, there should not be any-one giving flag signals. The applicable sections of NORAC which apply to when on-ground personnel are required are section (c) concerning malfunctions, and section (e) concerning cars not headed by an engine. Section (c) reads:

If automatic highway crossing protection devices are not functioning properly, employees must immediately notify the Dispatcher. The Dispatcher must issue Form D line 12 to all trains operating over the affected crossing(s). These trains

must approach the crossing(s) prepared to stop and not proceed until protection against highway traffic is provided by on-ground personnel.

### Section (e) reads:

If cars not headed by an engine are to be moved over a highway crossing at a grade not protected by automatic protection or a designated employee, a member of the crew must provide protection against highway traffic.

From reading these two sections, it can be gleaned that unless there is a malfunction in the automatic protection devices, or a train is reversing over a crossing not protected by automatic protection, there is no need for a flagman to be present.

## ANALYSIS

Based upon reading the relevant statutes and rules of the respective guidelines, a case could be made for either MUTCD or NORAC signals to apply when crossing a railroad grade crossing. Because either could apply, it becomes necessary to engage in a fact sensitive inquiry to determine which controls in a given situation. The first inquiry must be in the guidelines themselves. It is conceded that both MUTCD and NORAC can be applied when crossing a railroad grade crossing, but the question to be answered is under what circumstance each applies.

As adopted by the Federal Highway Administration, the MUTCD is the national standard to be applied to all highways and roadways. After a careful reading of the regulations and relevant legislative history, there does not appear to be any exemptions made for railroad grade crossings. Considering the language of the MUTCD regulations, these guidelines are comprehensive and are to be applied as the national standard for streets and high-ways. Since there is no exclusion for a road passing over railroad tracks, the court concludes that railroad grade crossings must come under the MUTCD. The specific MUTCD rules that apply to flagging procedures read that flags can be used to stop, slow and wave through vehicular traffic. The limitation set forth however is that the flags should only be used in an emergency situation, but again, as alluded to earlier, though the MUTCD

does not specifically define what an emergency is, the court finds that an emergency exists when all other methods of traffic control are inadequate to warn and direct drivers. In essence, the emergency is not necessarily the situation requiring the flagger, but rather the lack of any other means to warn traffic. Applied to the present case, the MUTCD did not apply because there was no evidence proffered to show that any type of emergency existed and, furthermore, the existence of the railroad warning lights is evidence that there were alternate means available to control traffic.

The NORAC rules also give authority to a flag person to control traffic. The NORAC flag signals, similar to the MUTCD, have a signal to stop, slow or to proceed. However, upon a careful reading of the NORAC guidelines, the only one of these signals that applies to vehicular traffic is the stop signal. The other signals apply only to the movement of trains. The NORAC rules allow for a flagman to give the stop signal only to vehicular traffic. However, in the present case, the flagman admitted in his deposition that he waved traffic through. This waving traffic through was beyond the scope of NORAC; therefore the railroad flagman was not following NORAC procedures. In addition, NORAC guidelines stipulate that a flagman is only to be used when "necessary." Though NORAC does not define what "necessary" means, the only reference to the use of flagman in the guidelines pertains to either when there is a malfunction in the automatic protection at a grade crossing, or a train is moving backwards past a grade crossing which is not protected by automatic protection. Based upon these limited situations in which flagmen can be used, the court finds that absent one of these situations it is not "necessary" for a flagman to be present. In the present case, both plaintiff and defendant admit the red warning lights were flashing, so it can be concluded that automatic protection was in proper order. From the pictures of the accident it appears as though the train cars were not headed by an engine. This fact seemingly meets part of the criteria; however the fact that the

red warning lights were working obviated the need for a flagman. The lights at this particular grade crossing were automatic and as such constituted automatic protection.

In the final analysis though, both plaintiff and defendant have strenuously argued that either the MUTCD or NORAC should apply. If these guidelines are followed to the letter, it appears that neither apply in the present case. In the case of MUTCD, there did not exist an emergency to warrant the use of its flagging procedures, and in the case of NORAC, the fact that the warning lights were in operation removed the presence of the flagman from the "necessary" requirement.

Based on the foregoing, the court grants both motions and evidence of both the MUTCD and NORAC is excluded. The jury shall decide the issue of liability on ordinary principles of negligence.

